UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| UNITED STATES OF AMERICA, | Case No. 3:19-cr-00007-MMD-CLB |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| KAMARI DAVIS, and DARRAYAH SANCHEZ, | |
| Defendants. | |

**I.    SUMMARY**

Defendants Kamari Davis and Darrayah Sanchez (collectively "Defendants") have been charged with four counts related to burglary of a gun store in Sparks that occurred on December 10, 2018 ("Second Case"). (ECF No. 22 ("Second Case").) Davis has also been charged by superseding indictment with two counts in Case No. 3:18-cr-00097-MMD-WGC for conspiracy and theft of firearms at the same gun store along with a separate store in Reno, Nevada on September 29, 2018 ("First Case"). (ECF No. 22 (First Case).) In both cases Davis has filed the same motion to suppress information retrieved from his iPhone ("Phone") after his device was searched pursuant to a warrant which he contends was granted and executed in violation of his constitutional rights ("Davis' Motion"). (ECF No. 101 (First Case); ECF No. 72 (Second Case).) Sanchez moves to suppress the evidence supporting the indictment in the Second Case, contending that the traffic stop of the vehicle Davis was driving on December 14, 2018, and in which she was a passenger, was constitutionally infirm and that the subsequent search of the vehicle—although such was conducted pursuant to a search warrant—was therefore improper. (ECF No. 73 (Second Case).) Each Defendant has moved to join in the other's respective

motion.[1] (ECF Nos. 74, 75 (errata), 76.) The government opposes Sanchez's joinder to Davis' Motion. (ECF No. 80.)

For the reasons below, the Court will grant Davis' motion to join in Sanchez's motion (ECF Nos. 74, 75 (errata)) but deny Sanchez's motion to suppress (ECF No. 73) and her motion to join in Davis' Motion.[2]

## II.  FACTUAL FINDINGS

The following facts are not in dispute and derive from warrant affidavits filed in the Second Case (ECF No. 72-1(also filed in the First Case), ECF No. 2 at 5–14; ECF No. 78-6), which are substantially similar.

The charges against Davis and Sanchez stem from an investigation by the Bureau of Alcohol, Tobacco, Firearms ("ATF") into a series of burglaries in Reno and Sparks, Nevada. (ECF No. 72-1 at 7.) As noted, the burglaries took place, respectively, on September 29, 2018 ("September Burglaries") and December 10, 2018 ("December Burglary"). (*Id.*) The former day largely concerns only Davis' Motion, which the Court does not rule on here. The Court, however, provides the details of that burglary for complete context.

### A.  September Burglaries and Related Events

On September 29, 2018, ATF agents responded to reports of burglaries at two federally licensed gun dealerships—RAC Guns & Ammo in Reno and Juggernaut Arms in Sparks. (*Id.* at 8.) ATF in Reno opened an investigation. (*Id.*)

The next day, Zuryess Roberts—who was Davis' co-defendant in the First Case—was arrested[3] by officers with the Vallejo Police Department in Solano County, California

///

---

[1] In addition to the motions and noted errata, the Court has considered the associated responses (ECF No. 102 (First Case), ECF Nos. 78, 79, 80 (Second Case)), and replies (ECF No. 103 (First Case), (ECF Nos. 81, 82, 83 (Second Case)).

[2] The Court has set a hearing on Davis' Motion.

[3] The charges against Roberts have since been dismissed. (*See* ECF No. 104.) The underlying facts of those charges may be found at ECF No. 72 in the First Case.

after a traffic stop and firearms were subsequently found in the car he was driving. (*See* ECF No. 72 (First Case).) After Roberts was arrested, he was questioned on scene without being first given *Miranda*[4] warnings and later questioned again for several hours during which time Roberts made incriminating statements. (*Id.*)

While Roberts was in jail, he made several jail-phone calls, including to his girlfriend. (ECF No. 72-1 (Second Case) at 8–9.) In a call to his girlfriend, he greeted her and then another male greeted Roberts (*Id.* at 9.) Roberts told the other male "facials nigga you took your shit off." (*Id.*) ATF special agent Christopher Temple believed the unknown male to be M.T.—a suspect in the September Burglaries who surveillance cameras showed had removed his face covering. (*Id.*) Investigators had made Roberts aware of the removed face covering. (*Id.*) During the call, M.T. denied that he took his coverings off and Roberts responded "What the fuck are you talking about nigga they showed me." (*Id.*) Roberts later asked M.T. if he had spoken with "KD" and told M.T. that he needs to speak with KD. (*Id.*) Roberts asked M.T. if KD still had two different weapons that were of the types that were stolen during the September Burglaries. (*Id.*)

A search of Roberts' Facebook friends includes a picture of a black-adult male with "KD" in large red letters superimposed on the photo. (*Id.*) The name associated with the Facebook profile and the picture was "Kamari Davis." (*Id.*)

**B.    December Burglary and Related Events**

On December 10, 2018, at approximately 3:12 a.m., Sparks Police Department ("SPD") Dispatch received an emergency phone call from a Juggernaut Arms employee reporting that the business was being burglarized. (*Id.* at 10–11.) As with the September Burglaries, sledgehammers were used to gain entry into the Juggernaut Arms. (*Id.* at 11.)

Surveillance video shows two people—a male and a female—using sledgehammers to break a glass door then entering immediately. (*Id.*) The male wore a hooded jacket, dark tennis shoes, and Nike "mechanics" style gloves. (*Id.*) The female

///

---

[4]*Miranda v. Arizona*, 384 U.S. 436 (1966).

3

wore black shoes with a stripe, black sweats with a stripe, latex style gloves, a hoodie and carried a smaller sledgehammer. (*Id.*) The individuals stole approximately 27 handguns and left. (*Id.*)

A patrol officer saw a vehicle leaving the area as he was arriving on scene and documented the license plate as 952D59 (Nevada). (*Id.*) Officers investigating the burglary ran the license plate and a records check showed the vehicle was registered to Vinchea Brown ("Brown") and provided her address. (*Id.*) Officers traveled to the address within about an hour of the burglary and found the vehicle there. (*Id.*) The hood of the vehicle was still warm when officers arrived. (*Id.*) Among other things, officers found a latex glove on the ground outside the car, another latex glove inside the car in plain view, and an application to purchase a firearm. (*Id.*)

Additionally, a Juggernaut Arms employee remembered a suspicious female in the store the previous day—December 9—at around 2:00 p.m. Video surveillance was obtained from December 9 showing an African-American adult female wearing shoes similar to the female suspect from the surveillance video of the December 10 burglary. (*Id.*) The female in the December 9 video was wearing a red hoodie and blue jeans. (*Id.* at 11–12.) Law enforcement noted that the female in the video was similar in height and built to Brown, to whom the suspect vehicle was registered. (*Id.* at 12.)

Based on the above facts relating to the December Burglary, an SPD Detective obtained a warrant for Brown's address issued by the Justice Court of Sparks Township, in and for the County of Washoe, Nevada. (*Id.*) Officers executed the search warrant on December 10, 2018, at 10:41 a.m. (*Id.*). During the search, investigators located female clothing matching the clothing that was worn by the suspicious female described by the Juggernaut Arms employee from the previous day (i.e., a red hoodie and similar blue jeans). (*Id.*) Investigators also located male sweatpants with a Nike logo that had blood on the front, and a sweatshirt with blood on the wrist. (*Id.*) After reviewing the video from the surveillance cameras in Juggernaut Arms, it appeared likely that the male suspect made unintended contact with shards from the shattered glass door as he broke into the gun

4

store. (*Id.*) In addition, the Nike logo on the male sweatpants matched the logo seen in the video. (*Id.*) During the search, investigators also discovered a Glock magazine in a drawer, in which items of indicia were found indicating that Davis lived at Brown's residence. (*Id.*) Police also found a bore brush for cleaning firearm barrels on the floor of the living room. (*Id.* at 12–13.)

Brown was arrested. During an interview, Brown said that Davis had been in Reno the day before the burglary. (*Id.* at 13.) Brown also was shown a picture of the female at Juggernaut Arms on December 9, 2018. (*Id.*) Brown denied that the female in the picture was her. (ECF No. 2 at 11.) Brown consented to a search of her phone and when investigators looked at her phone, they found phone numbers saved in the contacts list for Davis (under the contact name, "Khumari") and for his girlfriend, Sanchez (under the contact name, "Rayah"). (ECF No. 72-1 at 13.) Investigators learned that Sanchez had been with Davis and staying with him at Brown's residence. (*Id.*) Sanchez also resembled the female in the surveillance video from Juggernaut taken on December 9, 2018, in height and stature. (*Id.* at 12.)

ATF personnel monitored Brown's jail calls. (*Id.* at 13.) On December 12, 2018 at 8:25 a.m., Brown called Jronesha Brown. (*Id.*) During the call Brown asks if Jronesha had heard from the "two dumbasses" and Jronesha replied no, that they had not said anything. (ECF No. 2 at 12.) Jronesha stated that they were going to help out with bail. (*Id.*) Later in the call, Brown said that investigators showed her a picture of "them." Brown stated that she had said to law enforcement, "I'm like, like you have a fucking picture of her." (*Id.*) Brown went on to state they had her (referring to Sanchez) name and pictures of her. (*Id.*) Brown stated that the investigators had all of the information and that investigators should "go do y'all fucking job." (*Id.*) Brown questioned why investigators needed her when they already knew what happened. (*Id.*) Jronesha said she had been talking to "them" and told Brown they were in Las Vegas. (*Id.*) Brown said "they" had robbed a store with guns in it and that Kamari (Davis) needed to turn himself in because it was not fair to her (Brown). (*Id.*) On multiple occasions throughout the conversations Brown stated that the theory

5

investigators had concerning the burglaries was correct and named Rayah (Sanchez) and Kamari (Davis) as persons involved with the burglary. (*Id.* at 12–13.)

ATF personnel was granted a requested geolocation ping on Davis' phone and analyzed its historical location data, which showed that the phone moved from Reno, Nevada to Vallejo, California following the day of the December Burglary. (ECF No. 72-1 at 13.) ATF personnel also analyzed Sanchez's phone location data on December 13, 2018, which showed her phone had moved back from Las Vegas, Nevada to California. (*Id.*)

That same day, investigators interviewed Brown again. (ECF No. 2 at 13.) Brown stated that Davis and Sanchez had been staying with her in Reno, Nevada, since Friday evening, December 7, 2018. (*Id.*) Brown stated that Davis had a pair of olive-green Air Jordan shoes, which were consistent with the shoes worn by the male suspect in the Juggernaut Arms burglary. (*Id.*) Brown also stated that Davis drove a black in color Dodge Caliber, which was the main suspect vehicle from the September Burglaries. (*Id.*) Brown told investigators that Davis purchased that vehicle months ago from Crawdaddy Used Cars in Reno, Nevada. (*Id.*) Brown stated that she woke up early on Monday morning December 10, 2018, at approximately 5:00 a.m., to feed her daughter and noticed that her keys to her car were in the living room instead of in her purse where she had left them. (*Id.*) Also, she noticed that Davis and Sanchez were not in the apartment. Brown stated that the gray sweatpants and sweatshirt located in her apartment belonged to Davis but she did not know how long they had been in her apartment. (*Id.*) Brown stated that Sanchez always wore black and white Vans sneakers, which were consistent with the shoes worn by the female suspect in the Juggernaut Arms burglary and the female who was in the store the day before. Brown also described Sanchez as being smaller than her with dark hair. (*Id.*)

Investigators searched Davis' Facebook account and reviewed Facebook data from Davis' Facebook messenger that showed him trying to find buyers for firearms, one of which was confirmed stolen from another Reno burglary of RAC Guns and Ammo, a Canik

6

55 TP-9SF 9mm pistol with serial number: 18AT03273. (*Id.* at 13; ECF No. 72-1 at 14.) Davis also had pictures of other firearms that matched the models of firearms stolen from the RAC Guns and Ammo and the previous Juggernaut Arm burglaries, but the serial numbers were not visible to confirm. (*Id.*)

### C.     Charges, Arrest Warrants, and Roberts' Prior Motions to Suppress

On December 14, 2018, law enforcement submitted an affidavit in support of a criminal complaint and arrest warrants for both Davis and Sanchez. (ECF No. 2 at 5–14.) The criminal complaint, also filed on this day, alleged only two counts: conspiracy to steal, take or carry away firearms from the premises of a federal firearms licensee under 18 U.S.C. §§ 922(u) and 371 (Count One); and theft of firearms from the premises of a federal firearms licensee under 18 U.S.C. §§ 922(u) and 924(i)(1) (Count Two). (*Id.* at 1–4.)

The arrest warrants were also issued for both Davis and Sanchez that day by District of Nevada United States Magistrate Judge William G. Cobb. (ECF Nos. 3, 4; ECF No. 78-3.) Once the criminal complaint and arrest warrants were issued, the information was communicated to ATF agents in California. (ECF No. 78-4.) The ATF agents coordinated with Stanislaus County Sheriff's Office ("SCSO") to stop Davis' vehicle in California and arrest he and Sanchez on December 14, 2018, at approximately "1530" hours. (ECF No. 78-5 (ATF Report of Investigation); ECF No. 78-8 (SCSO CAD Abstract showing that SCSO Officers were dispatched as "ASSIST TO STING").) The ATF subsequently applied for and obtained search warrants for both Davis' vehicle—the black Dodge Caliber (ECF No. 78-6)—and his Phone (ECF No. 72-1).

On January 17, 2019, Davis and Roberts were similarly charged in the First Case by superseding indictment related to the September Burglaries. (ECF No. 20 (First Case).) Davis was charged with two counts: conspiracy to steal, take or carry away firearms from the premises of a federal firearms licensee under 18 U.S.C. §§ 922(u) and 371 (Count One); and theft of firearms from the premises of a federal firearms licensee under 18 U.S.C. §§ 922(u) and 924(i)(1) (Count Two). (*Id.*) Roberts was charged with the same and two other counts. (*Id.*) The same day Davis and Sanchez were newly charged by

indictment on four counts. (ECF No. 22 (Second Case).) They were charged with the same counts as Davis was charged with in the First Case as well as for possession of stolen firearms under 18 U.S.C. §§ 922(j) and 924(a)(2) (Count Three); and transportation of stolen firearms under 18 U.S.C. §§ 922(i) and 924(a)(2) (Count Four). (*Id.*)

### III. SANCHEZ'S MOTION TO SUPPRESS IN SECOND CASE (ECF NO. 73) [5]

Sanchez, joined by Davis, moves to suppress all evidence supporting the indictment in gist based on a contention that it does not appear that the traffic stop was conducted according to constitutional requirements and that the later search of the car Davis was driving amounts to poisonous fruit.[6] (ECF Nos. 73, 82.) The Court finds to the contrary.

An automobile stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996) "Officers may stop a vehicle in which they reasonably believe the subject of a warrant is traveling to execute the warrant." *United States v. Savath*, 398 F. App'x 237, 239 (9th Cir. 2010) (citing *United States v. O'Connor,* 658 F.2d 688, 691 (9th Cir.1981)); *see O'Connor*, 658 F.2d at 691 ("It is obvious that in executing the warrant, the agents could stop the vehicle in which they reasonably thought O'Connor was a passenger."). Moreover, a stop of a vehicle pursuant to a warrant is not invalid even where officers' "good faith belief" that the person for whom a warrant has been issued is traveling in the vehicle is "incorrect." *Id.*

///

///

---

[5]The Court will grant Davis' motion to join in this motion to suppress (ECF Nos. 74, 75 (errata)) as unopposed under Local Rule 7.2(d). Further, although Sanchez raises the issue of her standing to bring this motion, the government does not contest her standing to challenge the traffic stop. (*Compare* ECF No. 73 at 6–7 *with* ECF No. 78.)

[6]"It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was purged of the primary taint." *United States v. Washington,*490 F.3d 765, 774 (9th Cir. 2007) (internal quotation marks omitted).

In her motion Sanchez initially argued, among other things, that it was unclear whether the arrest warrant for Davis had been issued before the traffic stop and asserted that there was no warrant for Sanchez's arrest. (*E.g.*, ECF No. 73 at 2, 8.) In its response, the government explained that Davis' vehicle was stop pursuant to prior-issued warrants for both Davis' and Sanchez's arrest. (ECF No. 78.) The records reflect that the arrest warrants were in fact issued prior to the arrests (*compare* ECF No. 78-3 (showing the warrants received by the USM (United States Marshal Services) on December 14, 2018 and timestamped for 2:40 p.m.) *with* (ECF Nos. 78-5 & 78-8 at 4 (reflecting that SCSO deputies stopped Davis' car about 3:32 p.m. ("1532" or "15:32:09") ). The CAD also supports that the arrest warrants were executed almost immediately upon deputies stopping the vehicle, documenting "TAKING DRIVER . . . NOW" and "DTNING DRIVER AND X" at 15:35:16 and 15:36:23, respectively. (ECF No. 78-8 at 4.)

Sanchez nonetheless contends a constitutional violation occurred, arguing that the absence of police and car tow report(s) and bodycam recordings from the SCSO deputies, purportedly required under SCSO's policy,[7] (ECF No. 73 at 8–12) amounts to a constitutional infirmity because it is difficult to access whether the traffic stop was constitutional. (*E.g.*, ECF No. 82 at 8 (stating that "the entire basis of the Motion is that it is not clear the traffic stop was conducted according to constitutional requirements").) The government counters that the absence of police reports and other documentation from the SCSO does not warrant suppression because the SCSO was merely assisting ATF in executing arrest warrants (ECF No. 78 at 14–16).

The Court agrees with the government that suppression is not warranted here. While it would be ideal to have a more complete picture of how the SCSO went about assisting the ATF in executing the arrest warrants, that deficiency does not amount to a constitutional violation so long as probable cause to arrest either Defendant supported the traffic stop. Here, Sanchez does not clearly, if at all, challenge the validity of the arrest

///

---

[7]The evidence shows that it was ATF personnel—not SCSO deputies—that ordered the vehicle's towing. (*See* ECF No. 78-7.)

warrants (i.e., challenged whether it is supported by probable cause). (*See* ECF No. 82 at 10–11.) At best, Sanchez asks the Court to make such a determination as to Sanchez while conceding that "there indeed was some evidence to support probable cause." (*Id.* at 11.)

The Court finds there indeed was such evidence. The affidavit supporting the arrest warrants for both Davis and Sanchez essentially recites the facts provided in the Court's findings of fact above and Defendants do not materially dispute these facts (*see* ECF No. 2 at 13). To be sure, "[p]robable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Rodis v. City & County of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009) (internal quotations and citations omitted). The Court finds that the information in the affidavit supporting Davis and Sanchez's arrests for, at the time, conspiracy to steal and actual theft of firearms is more than sufficient to meet the probable cause standard. There is therefore no doubt, based on the above noted authority, that pursuant to the arrest warrants officers where constitutionally authorized to stop Davis' vehicle in execution of the arrest warrants for Davis and Sanchez.

Beyond this finding, Sanchez's arguments concerning the traffic stop—while apparently of good intent—are quintessential red herrings. Chiefly, Sanchez's argument regarding the absence of reports and other documentation amounts to a contention that it is unclear how deputies knew that it was Davis and Sanchez in the car, essentially challenging the SCSO deputies' reasonable belief regarding their presence. But it is evident that the SCSO deputies knew this information, although it is not documented in a report or body camera recording.

Again, SCSO deputies were assisting ATF in executing the arrest warrants. (*See* ECF No. 78-5, 78-8, ECF No. 73-2 at 6.) At minimum then, one may reasonably infer that ATF provided detailed descriptions of Defendants and the car Davis was driving to identify them in order to effectuate their arrests as the deputies in fact did here. The affidavit

10

1 supporting the arrest warrants surely shows that ATF knew exactly who Davis and
2 Sanchez were and that there was good reason to believe they were together. Further, the
3 affidavit provides that Brown had informed investigating officers that "Davis drives a black
4 in color Dodge Caliber" and where Davis had purchased the vehicle. (ECF No. 2 at 13.)
5 Additionally, ATF had been analyzing Davis' phone location data. (*E.g.*, *id.* at 11–12; ECF
6 No. 72-1 at 14–15.) Common sense alone would inform then that ATF agents, who
7 possessed this information, would relay it to SCSO deputies to assist them and therefore
8 SCSO deputies conducted the traffic stop and executed the warrants based on information
9 received. But, more than common sense, SCSO record shows that on December 14,
10 2018, deputies were "CALLED" to assist in a sting to execute "FEDERAL FELONY
11 WANTS." (ECF No. 73-2 at 6.) The ATF's Report of Investigation[8] states that on the same
12 day a "blue Dodge Caliber" was observed traveling on the interstate and an SCSO deputy
13 observed Davis to be the driver and Sanchez to be the passenger. (ECF No. 78-5 at 2.)
14 As noted, the CAD Abstract also reflects that SCSO deputies were assisting in a "sting"
15 and stopped a "BLK DODGE CALIBER." (ECF No. 78-8 at 4.) This information surely
16 supports the SCSO deputies' reasonable belief of Defendants' presence.

17 For these additional reasons, the Court finds Sanchez's contentions based on the
18 absence of police reports, body camera recordings and more documentation than
19 provided do not warrant a finding of a constitutional violation to invalidate the traffic stop.
20 In light of this conclusion, the Court need not further consider Sanchez's challenge of the
21 search of Davis' vehicle insomuch as she argues that the search of the vehicle is also
22 improper solely based on the premise that the traffic stop was improper (ECF No. 73 at
23 12–13; ECF No. 82 at 11–13). The Court will therefore deny Sanchez's motion to
24 suppress.
25 ///
26 ///

---

[8] While Defendants point out that the Report of Investigation was not prepared contemporaneously with the traffic stop (*e.g.*, ECF No.82 at 3), that fact alone does not undermine the substance of the information provided therein.

**IV.    SANCHEZ'S MOTION TO JOIN DAVIS' MOTION (ECF NO. 76)**

As noted, Davis filed the same motion to suppress in the First and Second Cases. Davis seeks solely to suppress evidence uncovered pursuant to a warrant authorizing a search of his Phone. (*E.g.*, ECF No. 72 (Second Case).) Although the Court will not herein address the merits of Davis' Motion, in the aim of judicial efficacy the Court considers Sanchez's motion to join in Davis' Motion (ECF No. 76). Ultimately, the Court will not permit Sanchez's joinder.

In response to Sanchez's motion to join, the government, *inter alia*, argues that the request to join is untimely and that Sanchez lacks standing to challenge a search of Davis' Phone. (ECF No. 80.) Sanchez counters that she may join in the motion based on her contention that law enforcement's acquisition of the Phone was a product of a constitutionally infirm traffic stop. (ECF No. 83.) Therefore, in light of the Court's finding of no such constitutional violation *supra*, the Court agrees with the government that Sanchez lacks standing to challenge the search of Davis' Phone. *See also Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (citation omitted) (explaining that in *Katz v. United States*, 389 U.S. 347, 353 (1967), the Court held that "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place"); *cf. United States v. Dore*, 586 F. App'x 42, 46 (2d Cir. 2014) (finding that defendant lacked reasonable expectation of privacy in phones that did not belong to him and in which he had established no subjective expectation of privacy); *U.S. v. Zabalaga*, 834 F.2d 1062 (D.C. Cir. 1987) (holding that a defendant who had no property or possessory interest in a rental car had no legitimate expectation of privacy in the car).

For these reasons, the Court finds that Sanchez cannot join in Davis' Motion and will deny her motion to do so.

**V.    CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines

that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that Davis' motion to join in Sanchez's motion to suppress (ECF Nos. 74, 75 (errata)) is granted as unopposed.

It is further ordered that Sanchez's motion to suppress (ECF No. 73) is denied.

It is further ordered that Sanchez's motion to join Davis' Motion (ECF No. 76) is denied for lack of standing.

DATED THIS 16th day of June 2020.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE